Mr. Sobel. Good afternoon, panel members. My name is Jonathan Sobel. I represent Herman Quiles in this matter that's before you. I'd like to start by saying that the U.S. has prevailed. I'm not referring to what happened at district court. I'm referring to the World Cup today. I'm sorry. The World Cup. Oh, thank you. We were going to have notes sent up from a colleague downstairs, but unfortunately he's in Washington today. So we've dutifully sat here doing our work, not knowing how the U.S. did vis-à-vis Algeria, and we appreciate the good news. One another. All right. Thank you. As I stated, I do represent Herman Quiles. Mr. Quiles was indicted in the United States District Court back in July of 2007, went to trial in January of 2008 along with his daughter and his wife, and was convicted in the district court of one count of conspiracy and 16 counts of money laundering. What's relevant for purposes of this appeal, we've attacked two issues before the court. One has to do with the motion that was filed for a new trial. He's not attacked legal sufficiency as to any of the counts of conviction as the daughter has as Gloria. No, Your Honor. The only thing that Mr. Quiles is attacking is this issue that has come up with the confidential informant who testified at trial as well as the sentence that was handed down by Judge Du Bois. Well, the confidential informant was shown to be an unsavory character after the trial. How long after the trial? Suppose he got convicted of something that he did five years afterwards. I mean, could you then say, well, this would affect his credibility, would have affected it, you know, five years before? I mean, what's the cutoff? Well, the interesting thing is the pro paniquity between the time that the trial took place and the time of the sentencing. Mr. Quiles hadn't even been sentenced at the time where this confidential informant was arrested, and it was right around the time that the confidential informant's trial was actually going on when Mr. Quiles was sentenced. But the offense conduct, the two episodes giving rise to separate charges, arose prior to trial of Mr. Quiles. Certainly. Right? And more importantly, there is no issue here on the part of either defendant that the government knew or somehow engaged in a Brady or similar violation in not providing information regarding Mr. Ayala. In fact, no suggestion they even knew anything. Right? I would agree with that proposition. But what you have here is someone who's been working for ICE since 2004, according to the paperwork that he signed each successive year after that, saying, I have not committed any crimes. Now, the government has taken the position that While I'm working for you. While I'm working for you. Now, the government has taken the position That's not inaccurate, is it? It is inaccurate. The government has taken the position that Mr. Ayala committed two acts against these young women, and it was at one point in 2002 and again in 2007. And the purpose of having a hearing in the district court would establish that this wasn't two separate acts. This was something that was ongoing from 2002 until 2007. This was over The hope was ongoing. The acts that Mr. Ayala was engaging with, with these young women, minors, that was going over a course of five years. This was the testimony that was elicited at his criminal trial. This wasn't an isolated, two isolated incidents. This was an event. This was something that kept going. So I think it's important that the panel Do you allege that in your motion for a new trial? Unfortunately, I wasn't the attorney who Is that alleged in the motion for a new trial? It's not alleged in the motion for a new trial. It was alleged in my All right, so that's what we're here. We're here trying to determine whether or not the district court was correct in denying the request for a new trial under Rule 33. If you didn't allege it, how could you say the district court was wrong and evaluate it? Well, the district court didn't give us an opportunity to have a hearing where Mr. Ayala would have been brought in to testify as to the allegations that were being made against him. And I believe The district court thought that as a matter of law, it couldn't grant a new trial on the papers before it. So it made a legal determination, if I understand. What do you want us to do? Remand it and tell him to exercise his discretion? Well, the ideal In other words, frankly, when I read it, I was a state trial judge for a lot of years. I thought to myself, well, I'm not so sure that I wouldn't have had an alternative ruling. You know, I can't do this, but even if I could, I won't. And, you know, I wouldn't exercise We get rulings like that, you know, all the time, where judges say, I don't think I can do that. But even if I could and I have discretion, I wouldn't. That's not an unusual ruling. But this judge didn't do the second, did he? No, he did not. So you want us to remand it to him to do the second? Ideally, what I would like is a new trial. Well, of course, but we couldn't possibly. What you're saying, are you saying that he had no discretion? That he had to grant a new trial on the basis Now, if that's true and we agree with it, then there would be no reason to remand it. But is that your contention? That he said he had no discretion to grant it, and you say he had no discretion not to grant it? I think based on the record that the judge had, he had the discretion to have a hearing on the issue. And that did not occur. And I believe that there are other cases which say where it's so compelling, impeachment evidence still can be used as a basis. Didn't he effectively exercise discretion by, as I recall, as an alternate ground for his ruling, suggesting that even under 403, this wouldn't come in? He was a trial judge, wasn't he? Well, I believe the conviction would come in, not necessarily the facts of the conviction. And the fact that maybe Mr. Ayala was perpetrating a fraud on ICE. Is that what the ruling was? That simply, I mean, did he break it down as to 608 or 609 admissibility? It would not come, in any event, it wouldn't come in under 403? I don't know if the judge ever got to 403. I know he addressed 608 and 609 in the opinion. But going back, when you were before the district court, there was no conviction. There was no conviction. That's right. The conviction occurred. So how can we say that based on charges, that that time hadn't been proven, that the district court was wrong and not granting a new trial? Well, because the situation was Mr. Ayala, if we were allowed to explore that, had lied to ICE. And that's what the allegations were in that tangential state court case, that he lied to ICE, that he hadn't committed any crimes within the applicable period. And I think that was wrong. And if we knew that information at the time of trial, obviously we would have. But that's what he said. But the problem is that even if the charge had been made and you knew about it at the time he was testifying, apparently the district court said you couldn't have used it anyhow. Because a charge, of course, proves nothing. No. You weren't going to have a trial on whether or not this person did engage in those activities. You couldn't have a collateral trial. Well, you're certainly allowed to test the witness' credibility. Okay. But this had nothing to do with his testimony. About 35 years ago I was sitting in a jury trial as a state judge. The defendant was convicted, and a number of months later the prosecutor was running a tape on the principal witness unrelated to this, played me the tape, and the tape explained how he had lied at the trial and got this guy convicted. Now. So I granted a new trial, of course, but that went right to the heart of his testimony at that trial. Well, we believe that the fact that he lied to ICE repeatedly went to the heart of his testimony. Isn't that merely just impeachment? I mean, it didn't go to the heart of the money laundering transactions with your client. Well, it certainly did because this individual was the only one that was present during any of these. But you have the transcripts. He was wired. He had the transcripts. The transcripts were part of the case. And what I take from the transcripts, and it's hard to, sitting there I'm sure it's hard to imagine, but if I say something into my jacket like this, then I could say anything. And you would be the subject who would be listening, or maybe not even hearing it. That's true, but on the transcript there are others who spoke. There's others, but it's very, very sketchy. If somebody says, hey, is that drug money? Ha, ha, is that drug money? You know we can't tell unless Ayala gets up and says, yay or nay. So it's really his testimony. I see my time is almost up. I just wanted to address the issue with sentencing. Let me, before you get to sentencing, I am still trying to figure out how this evidence would even be admissible. I know what the test, the multi-pronged test is. I know that the general rule is that it can't simply be impeachment evidence. But I'd like to know how under either 608 or 609 this evidence comes in. First of all, if I cede you the point that this is newly discovered evidence, that this is the conduct because the conviction did not exist at the time of trial of your client, right? Right. So it's the conduct that becomes the evidence. That means you don't have a conviction to get in under 609. So it's out the door. Right. It has to be the conduct under 608. How do you get that in as 608 is written? My understanding under 608, you're allowed to attack the witness's character and truthfulness. Character for truthfulness or untruthfulness or evidence of truthful character. I think based on this information. I mean, I know you want to prove to the jury that Ayala is a bad guy. I know any trial lawyer worth his salt is going to want that jury to know that Ayala is a child molester. That is, I'm sure, precisely the reason why Judge Du Bois did, in fact, as a final and alternative ground, say finally, given the abhorrent nature of the crimes with which Ayala has been charged, any such evidence would likely prove so prejudicial as to be excluded under the balancing test of Rule 403. But without even reaching 403, I want to know your theory of admissibility under 608. The question is, Mr. Ayala, you signed a form that says that you have not committed any crimes while you're working for ICE. Isn't it true that during this period of time you were, you have committed a crime? You were engaged in such a crime? But the 608 talks about a conviction. 609 says conviction. 609 talks about a conviction. So there was no conviction. So what you would have to be having is sort of a collateral trial of whether or not he was, he committed these other crimes. We're asking to have the right to ask him those questions. That's what we're seeking. That was, that right has been denied the district court. If I may just briefly address the sentencing. Mr. Quiles was given 60 months as a sentence. It's our position that there were procedural errors made at the sentencing, whereby if you read the transcript from the sentencing, Judge Du Bois, other than saying that drug dealing is bad and Mr. Quiles was fostering drug dealing, he doesn't really explain the sentence. I understand he gave him 18 months less than what the guidelines were, and I do appreciate that. But there was no discussion as to why. And if you, looking at the substantive aspect of the sentencing, this is a man in his 70s, stellar member of the community up to this point, no prior convictions, a father, a grandfather, had held various positions in the Commonwealth of Pennsylvania. It's our position that Mr. Quiles should have been given a lesser sentence based on all his good deeds up to that point. All right. Thank you, Mr. Sobel. Mr. Griffin. Good afternoon, Your Honors. My name is John Griffin. I represent Gloria Quiles, and if I might, I am the one person in the room that has been with this case the longest. I had been there with its inception. We have a different counsel from Mr. Herman Quiles. We have different counsel for the government. And, Judge Greenberg, if I can address you initially, I agree. I agree with exactly what you had said to Counsel Sobel. My position is that what should have been granted in this case was an evidentiary hearing. I do believe that making a decision that warrants a new trial may actually be jumping the gun somewhat. I think what would have to occur is an evidentiary hearing, and at that evidentiary hearing it would have been fleshed out, one, would this evidence have been allowed to come in, and two, if it was allowed to come in, what would have been the parameters that it comes in? I agree wholeheartedly that this money laundering case cannot take a detour and become a separate trial on whether or not this individual had committed heinous acts against children. I agree with that. But if we were then … Would you like a hearing before the district? I believe that a remand is in order for a hearing back before Judge Du Bois to determine whether or not this particular evidence, as it's fleshed out, and the theories as how it would be fleshed out, would then be admissible. And I contend that the evidence would have been admissible, not to show from a character standpoint that this is a bad individual, but in particular to show that he had previously, in his testimony, conceivably lied not only to ICE when he filled out those forms, and by him doing what he did, it essentially allows, and by no stretch, and we'll make this clear, I have known this government prosecutor for quite some time, at no point in time was there any hint that the government was aware of any of this at all. If I could just very quickly move off to the side for a second, I was in the Criminal Justice Center standing in line when I turned around and noticed the individual staring at me. I did not recall who he was. When I went up to the courtroom that I was supposed to be in, and I signed in to represent Defendant Joe Blow, right underneath him was Hector Ayala. I then went to the prosecutor, who I know, and I said, what's going on with this? Who is he? What's he doing here? Oh, Mr. Griffin, you wouldn't believe it. You wouldn't believe what he's charged with. That was the first knowledge of this individual. It just purely was happenstance, absolutely purely happenstance. I then called my co-counsel, and we started to figure out, what the heck do we do here? This is pretty interesting. And that's how it originated. So by filling out these forms and asserting to the government that he is crime-free, he is not committing or has not committed any local, state, or federal crimes, it actually causes the government, from a strategy standpoint, and it allows the government to essentially vouch for his credibility, to essentially put this gentleman forth knowing that he is an individual of decent character. Because this was an individual that we knew nothing about. This was not a gentleman who got in trouble. This was an individual who walked into ICE and said, I feel like making money. Let's go back to your motion for the new trial under Rule 33. Did you allege, and I understand the timing when you filed that. Yes. But did you allege at that time that he had lied to ICE in that motion? I don't believe I did. I don't believe I did at that time. So what the court had in front of it when it decided that motion was the allegation that he had been charged with offenses in 2002 and then, I believe, 2007. That was it, correct? Yes. So why isn't that the parameter under which we're evaluating the court's decision on the motion for the new trial? Well, not necessarily, Your Honor, because respectfully, this information is coming in. We're trying to develop it. We don't even really know, and just as a side note. Did you ever amend your motion after you got the additional information? We did not amend it because a lot of information did not come to us, quite honestly. In fact, you have three years to file a Rule 33 motion. You could file another Rule 33 motion, could you not? I believe that's correct. I do believe that's correct. So a lot of this information did not really come to us until the record was completed trial.  And the local prosecutor is essentially limited to say, take a look at the public documents and that's all. So there is a limit as to what that information is. Just as you have a limit, we have a limit. We have to evaluate what the district court did best. I absolutely agree. And what I'm respectfully saying is a hearing that would allow for the flow of that particular information and make an informed decision. Counsel, I've understood it. I see where your reasoning is. I'm not going to allow it. It's different than just summarily denying a hearing because there is still so much that we did not know. Did you ask for a hearing in your motion? I don't think I specifically asked for a hearing, but I must admit, candidly. How could the court have granted something you didn't ask for? I think when we're asking for a new trial in that, and I certainly take my blame if need be, but I honestly would have thought that inherent in that is a request for a hearing to flesh this out. It was fully aware that many of us did not know anything more than those allegations that we were able to advance. The government, when it responds and talks about the information in terms of when he was charged with, it was our information that I was able to gather, and frankly, I gathered it from a defense attorney in the case representing a co-defendant who told me these are what the allegations are. So we were flying somewhat by the seat of our pants on just generic information without any specificity. So I don't think the point is that we should then have had a mini-trial to determine if he's a child molester, but the fact that there was testimony that he had given that essentially caused the government to vouch for his credibility in that essentially leaves us with the position that I don't think the evidence is admissible simply to show that he's a child molester, but to get into the fact that he had lied to ICE, which goes to the very core of the case. One of the things that you mentioned, didn't mention, I should say, on this hearing, wouldn't the court, in addition to what you said, also have to determine whether or not it's likely that if this had been known and was used for impeachment purposes, that the outcome of the trial would have been different. I agree. I believe I addressed that in my brief. I certainly thought I did. Well, you may have. And, Your Honor, with all due respect, if this evidence would have come out, depending upon how it would have come out, for instance, Mr. Isle is on the stand and we are permitted to go into allegations in the fact that he had lied to ICE based upon the fact that he had not previously disclosed to ICE what his activities were. If we would have first gotten beyond Fifth Amendment issues, and I'm not so sure we would have even gotten beyond that because Judge Du Bois would have said he needs to have counsel right away. So if we would have gotten beyond that and he would have then said, yes, I lied to ICE, and yes, I think. It's interesting because as you present the argument today, it's my concept, at least, that it has a different focus than the way it was presented in the trial court. Because the way as I understood it, the way it was presented in the trial court was, hey, look, look what this guy did and this shows that this is good impeachment evidence on the basis of his conduct. But the way you present it today is it's impeachment evidence because it was misrepresentation to ICE, which is a different focus. I agree, and I only have my honest explanation. We're flying by the seat of our pants back then, and as I thought about it, I believe this to be the more meritorious argument. Did you know when you made your motion that he had made these representations to ICE that he had not been violating the law? Well, I knew because I was trial counsel, Your Honor. So you did know, so it could have been put on that basis then. I would imagine it certainly could have been on that basis, but how it all tied into what I thought was the best approach legally, I can only admit that I did not see it that way, did not flesh it out that way, and perhaps that was certainly my error. Don't feel badly about that. It's easy when you sit here and you look at what you should have done. I understand that. It's not so easy when you're trial counsel. I understand, and I thank you very much. But my point is that if I can go on real quickly, if he would have then said at trial, yes, I lied to ICE and the whole bit, I think the record is developed. We then can't go into anything more because the point is made. However, if he then says, oh, no, I didn't lie to ICE, none of that is true, then I think we have an ability under certain parameters set by a district court to attack that witness's veracity and credibility. And I think a hearing to determine how that occurs would have been critical in this case because, frankly, I'm not so sure that a new trial may be feasible, quite honestly, until we get to a point where a hearing determines what could have legitimately come in or not come in. But I think it's important that it's not just to show that this gentleman is a person of ill repute, but a person who lied to ICE and that testimony, when it came in, allowed the government to get to a point where they can say this is a credible witness. It goes to the core of the case. I know I'm out of time if I can use my rebuttal just so quickly. What I think is important is to keep this in mind. Credibility is everything with this witness. It is not simply to say that, as the government alleged, we have the transcripts of what occurred, so forget about his credibility. Why don't we just listen to the body wires? That fails in two respects. One, throughout this testimony of Ayala was talk about facial expressions and different things. They're not picked up on a transcript. They are entirely based on his credibility because, understand from the record, this gentleman goes into this facility. The agent is around the corner. He does not see anything that's going on. When this individual comes out and reports to the agent, his credibility is wholly in question because he is the one who later sits down with an interpreter for the government and says, okay, here's what occurred. I spoke to Judge Fisher. That's his voice. I spoke to Judge Smith. That's his voice. That voice in the background is that of Judge Greenberg. In addition to which, and we all understand this, when you try these cases and have tape, you play the tape and then you stop it and then you allow the witness to testify. That's right. So his credibility is directly at stake in testimony. And then you play more of the tape and then so we all understand. Okay. Thank you, sir. By the way, did either you, Mr. Griffin, or you, Mr. Sobel, reserve time for rebuttal? I don't recall. I thought I reserved two minutes, but if I didn't. I don't think either of you did. I don't believe I did. Whatever your call. Thank you, sir. Thank you very much. Ms. Foulkes. Good afternoon, Your Honors. My name is Andrea Foulkes. I represent the United States in this consolidated appeal. I would like to address first the issues that obviously have been the main subject here, although there have been others raised in the appeal. The evidence in this case clearly was based on a number of prongs, one of which we would concede included the credibility of Mr. Ayala, but not to nearly the extent that the counsel for either defendant has elevated it well beyond the way they described it in their Rule 29 motions. We have a case where, on numerous occasions, a man unknown to the defendants come into a money service business with bags of thousands of dollars of small currency in a Dunkin' Donuts bag and is allowed to hand that bag to one or more of the defendants through the employees-only door, and then the defendants receive excessive fees, ten times the fees they would receive in ordinary transactions, for that. And for that, they convert that money into structured transactions over the course of periods of time, holding cash, so that the transactions don't happen in a way that would reveal the source of the money. And all of that is, in fact, recorded on tape so that their voices, their own voices are heard in the course of these transactions. This is not a case of a single witness with uncorroborated evidence. Clearly, the testimony of the agent, the transcripts of the tapes, and the tapes themselves were heard by the jury. That's something we can't really capture in any writing or in the cold transcript, but the jury heard all of those things. The transcripts were the tapes in Spanish or English? They were played in Spanish, but the transcripts were also in English, so that obviously the juror- The tapes, I asked about the tapes. Oh, the tapes were in Spanish. But the importance of having the tapes- So the jury heard the tapes, but unless you had some bilingual jurors, not many of them understood them. Well, simultaneously- And were thereby dependent upon the cold transcript- That's correct. That they had before them while the tape- Frankly, we would have been delighted with bilingual jurors in this case. They would have heard more. Your suggestion, I suppose, was a little bit misleading, because you were telling this panel that the jury had the benefit of the tapes and hearing what was said. It wouldn't mean a damn thing unless the jury understood Spanish. I perhaps used the wrong choice of words. Obviously, in a bilingual situation, the transcripts are evidence in the case. You can't rely on the jury to understand another language. But the reason that I pointed the fact that the tapes were played, they're not always done in a bilingual context, is that they heard all the sounds that surrounded the conversation and the inflection and the way things were said and the squeaking door when the employees-only door opened and closed. And they were allowed to assess those things. Those were important to both sides to allow the jury to hear it, even if they didn't understand the language spoken. In this case as well, the jury, you know, had the corroboration of Agent Galambos. The money goes in. The money comes out. It's converted. It's handled in a bizarre sort of way. I gather that you're raising all this to point out, maybe I have it wrong, but to say, well, the appropriate exercise of discretion would have said, we're going to deny the new trial because even if this came in, the case was very strong anyhow and it wouldn't have changed anything. Well, there's no doubt. That is certainly our position. It would not have changed anything because the fundamental precepts of this evidence rested on the prongs of the tapes and the corroboration as well. Would we be the body to make that determination in the first place? In other words, the trial judge undoubtedly has a better feel for that than we do. That's right. I mean, if he had discretion here, didn't he rule? Judge Smith had an interesting point because he had discretion as to admissibility maybe, 403 Wang, but I think what he said was he had no discretion as to granting a new trial here. As a matter of law, he couldn't grant it. Well, what he said was that there was no conviction. So clearly there is no 609 issue before him. There was no discretion as to Rule 609 because he could not rule on a conviction that hadn't happened. But didn't he say he couldn't have discretion to rule where it was strictly impeachment? Well, what he did say was that Rule 608, which would allow impeachment on prior bad acts that didn't result in a conviction, require false statements and dishonesty and these sexual offenses don't come in under that and that in addition to that, had he ruled on the basis of what happened in the underlying case that Ayala was ultimately convicted on, that he would have excluded that under 403. So he did exercise discretion, or at least he previewed the discretion he would exercise as the trial court in excluding that evidence in any event. I will point out, Your Honors, that if the jury had relied exclusively on the credibility of Mr. Ayala, they clearly would have done things differently with respect to their verdict against Gloria Quiles because And they acquitted her as to numerous of the substance. Exactly right. Not until she said on tape things that made it abundantly clear, they could not any longer ignore, that she totally understood what was the nature of the business going on here. And once that happened, that of course would lead into the next argument that hasn't been orally argued here, but on the sufficiency of the evidence for those remaining counts, but it makes it also clear that the jury does not rely on Ayala. They rely on the corroborating evidence that supports that. I would like to point one other thing out because counsel in its briefs and in its argument takes as a matter of faith that Mr. Ayala lied to ICE about his prior bad acts. And I would beg to differ. The exhibits that counsel included in the supplemental joint appendix starting at 1536 are the instructions to the confidential source. These are these alleged inquiries of Mr. Ayala. In fact, they're nothing of the sort. They're instructions to him as to what he may or may not do as a confidential source. And if you review those, each and every one of them has a list of 11, 12, or 13, 11 or 12 items which simply say you're not an employee of customs, you're not a police officer, don't represent yourself as a police officer, you're not permitted to violate any laws, you don't have any special authority to carry a weapon, et cetera. What page? Thirteen, I'm sorry, 1536 and beyond. I assume, though, if you are categorizing these as instructions as opposed to statements made by Ayala. Exactly. That there at least is an unwritten understanding that if something varies from the instructions, he's to tell them. But nothing did because the events that occurred except defense counsel are now saying that the record of Mr. Ayala's case shows that the sexual assaults occurred over a continuous period of time. Well, there's nothing in this record to support that, zero. In fact, the district court, what they put in the district court and what they put even in this court, in their brief to this court, which was stricken by the district court as irrelevant, doesn't even suggest that. That the events took place. But Ms. Fultz, the instructions that you just referred us to. Yes. Include at number three, you are not permitted to violate any law. That's right. There's no temporal restriction. No, but it doesn't inquire did you ever violate any laws in the past. It doesn't give any implicit direction. Ms. Freeman, I hereby state that I have read and understand the above conditions set out to me. Yes, that's correct. And as cooperating. You don't think that that suggests any kind of obligation of disclosure? Of what? Of the offense conduct. The offense conduct to place in 2000 and 2001, four years before he ever became an informant. I don't in any way give any comfort to the horrific acts he committed. I don't want to suggest that I think that he's a wonderful person or he should be a witness for the government again. Anything of that nature. I'm simply saying that the strict reading of these instructions are no different than giving somebody warnings without having that. There's nothing to indicate that he has to disclose something he might have done four years ago that nobody had yet complained about, that he was never charged with, that no one had ever filed a complaint against him. I don't think that there's anything in these instructions which would suggest that he lied by not disclosing events that occurred four years before he ever became a confidential source. It's at least as of today. Defense counsel, all they're asking for is a hearing. Well, today they're asking. I beg your pardon. Since there's an interest of justice provision in Rule 33, isn't the government interested in knowing how bad this guy may have been? Well, no, and I'll tell you why. No? I'll tell you why. At the end of the day, given the 403 analysis here, which is inevitable, and I have found no case, and in fact the one case that had been cited by the defense that I looked up came to the same conclusion, that the underlying sexual conduct, however horrific, doesn't come in. It doesn't come in. So that what is left is conceivably a conviction because now we're at the post-trial part. But at the time of the trial in this case, not even a conviction would come in. The question would only be whether he lied. There was no conviction. There was no conviction. And so if all he did at that stage was determined to be lying to ICE, that is near impeachment. It's a classic case of what does not get a new trial under Rule 33. So we're back to the same thing, hearing or no hearing. And, in fact, the district court said so. The district court said even if we had a hearing, and where they said that, where the district court said that, was after the Rule 33 was determined by the district court. The first time a hearing was even mentioned was in a bail petition pending appeal by Herman Keles where he says, oh, we didn't get a hearing. Well, the district court points out, you never asked for a hearing. And, in fact, getting a hearing wouldn't change anything anyway because the analysis is the same. It's a clear legal standard. And they can't ask for a hearing for the first time now in this court. It doesn't really change the- Do you agree they could file another Rule 33 motion? Well, even if they did, the analysis at the end of the day comes back to the same legal analysis. And even if they were permitted to inquire as to whether he lied to ICE and whether he did any other form of lying, this is mere impeachment evidence. It's extrinsic to the case. It doesn't affect the guilt or innocence of the defendant. It has nothing to do with his conduct as a cooperating source. It simply has to do with matters that occurred four years before he ever started working for ICE. So I would suggest that, clearly, it doesn't meet the standards of Rule 33 on its best day. So a hearing is simply not required. It's a significantly different form of impeachment evidence, however, that would exist in a subsequent Rule 33 motion, isn't it? Well, I don't understand- The difference between conduct that constitutes child molestation in and of itself for impeachment purposes, which seems to me to be impossible, but that was how I read the proffer, whether or not defense counsel were sincerely or were actually proffering it as such, as opposed to evidence of either a failure to disclose or even of an untruth being spoken by a snitch to the officers for whom he was working. Well- Very different form of impeachment. Surely it is, but there is no precedent which would overrule a court's assessment, as the district court has already assessed, that this would be an improper exercise of the court's discretion to exclude this horrific, extrinsic evidence on a 403 analysis. So that is why I say to the court, at the end of the day, the defendants are in the same place and the impeachment material is not the underlying rape, as they put in colorfully in their briefs, repeatedly raping children. The more you talk about it, however, it sounds to me a little bit like Giglio. If the government had known about it, there is no question we would have disclosed it, but that doesn't make it admissible. We disclose material all the time that's not admissible in a court of law. They can raise the argument and we will come to the same place each time. That's all I say, is that were this evidence admissible, we would be in a perhaps different posture as to its importance, but it's simply not admissible under 403. The Perryman case makes that very point. This court affirmed that case. It's a non-presidential case. It's the one that counsel found. It's the only one we found as to a witness and whether or not a prior sexual offense comes in. This is not crime and falsity. It doesn't go to dishonesty. I don't want to foreclose any additional questions from my colleagues on the Rule 33 motion if they have them, but I'd like to turn to a question that I have regarding the substantive counts. Yes. In fact, one in particular, but you have already referred to the discerning nature of the jury and their ability to make distinctions between certain of the substantive counts and what Gloria knew at some point in time and later counts. She was acquitted of some. She was convicted of others. I assume, and it's not fatal to your position in any way if you agree with me, that you would concede that the evidence overall as to Hermon was stronger than it was as to Gloria. Yes, I can concede that. But as to count 15 in particular, and especially because counsel has not reserved time for rebuttal, I must ask you about that count. As I recall the record, there is no testimony from Ayala that places Gloria there. There's no conversation with her, obviously, because there's no testimony that she is there. The only testimony that I recall is that her vehicle was seen parked right next to the Aruba business. Yes. I've got a count to stand. There is one other piece, and it's the only piece which causes me to… More than a scintilla? Well, that will be up to you to decide. And I stand here just to say that, of course, the jury is, while they're not permitted to make their judgment on speculation or conjecture, that her words and deeds were evidenced the following day about her knowledge the prior day. And I, as I said, I was not… And that was specifically what? That when he came in, her first statement to him was that they couldn't convert the money that he left the previous day because the new computer system hadn't been installed. Evidencing her knowledge of that happening, her reassurance that the computer system is going to be installed, and that she was aware of that, even if she was not an active participant in that transaction. She had, from the time that she understood the nature of the transactions and how Mr. Aiello's money was being represented, she evidenced an intention by that statement to help facilitate the continuing transaction or the reasons why the transaction couldn't have been completed the prior day. I will concede, Your Honor, that by far that's the weakest count. And were that to not be affirmed, the government would not be out of shape. The other counts, we think, were well supported. And in that, it indicates that the jury related back, I believe, from the following day's statement to her knowledge of what happened on the prior day and her reassurance to Mr. Aiello that they did their best the prior day, but that… Is that how you constitute aiding and abetting? Well, aiding, yes. I think it does. I think it's real close on that count. But it certainly does in the sense that once a person is aware of the nature of the crime that's being committed, giving their participation doesn't have to be active. It can be an act of relatively slight importance. I think that's the Burrell case in 1974. And, you know, for example, a person can be a receptionist in a flagrantly fraudulent company knowing that fraud is going on constantly. And just being someone who directs traffic, says, oh, Mr. Biggin, I wasn't available, but please come back this afternoon because he's going to take care of you, that sort of thing, would be aiding and abetting even though they're just the receptionist. As long as they know what the nature is of the fraud that's going on. And I would suggest that that count, I concede, is clearly the weakest. But all others are well supported. I think the jury was not irrational in finding that count as well. It's up to this court as to whether or not you want to sustain that particular count. Just to take the last 13 seconds to talk about the sentence, as it was raised by Herman Quiles's attorney, clearly this was a reasonable sentence. It was 18 months below the guidelines. Herman Quiles was clearly the actor that was in charge of this operation. He drew his family into it. He hid $600,000 from U.S. probation. Was there any procedural unreasonableness? None, none. In fact, this court actually addressed all of the procedural issues required, and certainly under RITA, this court addressed in a very specific fashion all of the reasons why the court felt that 60 months was the appropriate sentence. Frankly, we thought it was light. And that would, I think, end my time. Thank you very much. Thank you very much. I thank counsel very much for their helpful arguments. We'll take the case under advisement, and we'll take a very brief recess. Thank you. Thank you, sir.